**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

DESMOND LEWIS                                CIVIL ACTION NO. 15-2034

VERSUS                                       JUDGE S. MAURICE HICKS, JR.

CITY OF SHREVEPORT, ET AL.                   MAGISTRATE JUDGE HORNSBY

### MEMORANDUM RULING

Before the Court are Defendants, the City of Shreveport ("the City"), Officer Garrett Hayes ("Officer Hayes"), Corporal Michael Tong ("Cpl. Tong"), Corporal Joshua Owen ("Cpl. Owen"), and Corporal Christopher Bordelon's ("Cpl. Bordelon") Motion for Summary Judgment (Record Document 53) under Rule 56 of the Federal Rules of Civil Procedure seeking dismissal of all of Plaintiff, Desmond Lewis' ("Lewis") claims. For the reasons stated in the instant Memorandum Ruling, Defendants' Motion for Summary Judgment is hereby **GRANTED**.

### FACTUAL AND PROCEDURAL BACKGROUND

This action arises from Lewis' arrest, during the daytime, of July 12, 2014. On Saturday, July 12, 2014, Lewis was staying at his grandmother's apartment at the TreeTop Apartments in Shreveport. See Exhibit I, p. 14; see Exhibit J, pp. 8-9. The reason for his stay at his grandmother's apartment in Shreveport, as Lewis resided in Houston, was to be evaluated and treated at Brentwood, a behavioral health facility. While at his grandmother's, Lewis left the apartment complex and walked down a trail in a wooded area to Walgreens in order to pick up medications relating to his psychological condition. See Exhibit G, Lewis Deposition, pp. 33, 38. The pharmacy did not have his prescriptions on file and had to call for a doctor's authorization. See Exhibit G, p. 40. After being

informed that the pharmacy did not have his prescription, Lewis left Walgreens and began walking back toward the apartment complex on the trail. See id. at pp. 40-42.

In the meantime, the Shreveport Police Department Community Response Unit ("CRU") was looking for a robbery suspect. At that time, members of the CRU unit wore a gray polo shirt with City of Shreveport emblems on each shoulder, a black tactical vest with "POLICE" written on the front and back in white letters, black tactical pants, and drove black Ford Crown Victorias with a Shreveport Police emblem on each side. See Exhibit B, Cpl. Bordelon Deposition, pp. 15-16, 54-55; see Exhibit B-2, Photographs; see Exhibit C, Cpl. Owen Deposition, p. 55; see Exhibit A-10, SPD General Order 901-05. On July 12, 2014, the CRU received information that the robbery suspect, a black male named LaDarius Benjamin ("Benjamin"), was staying at the TreeTop Apartments. See Exhibit A-1, Offense Report; see Exhibit B, pp. 61-62. Cpl. Bordelon and Cpl. Owen were two of the CRU members who went to the apartment complex to try to locate Benjamin. When they arrived, Cpl. Owen walked around the apartment complex while Cpl. Bordelon spoke with the apartment manager. See Exhibit B, p. 67; see Exhibit C, p. 50. Cpl. Bordelon learned that Benjamin was staying at the apartment complex and that he had just left the location, and Cpl. Bordelon was pointed to a trail that is south of the apartment complex. See Exhibit A-1; see Exhibit B, pp. 67, 73. Cpl. Bordelon and Cpl. Owen then got back in their patrol unit and drove to Five Oaks Street, which is south of the apartment complex at the end of the trail. See Exhibit A-1; see Exhibit B, pp. 73, 75; see Exhibit C, pp. 53-54.

When Cpl. Bordelon and Cpl. Owen turned onto Five Oaks Road, they observed a black male walking on the trail in the direction of their vehicle. See Exhibit A-1; see

Exhibit B, pp. 76-77; see Exhibit C, p. 54. Cpl. Bordelon stopped the car and Cpl. Owen directed Lewis to come to the vehicle in order for the officers to speak to Lewis and question him, but Lewis turned away from them and began running. See Exhibit A-1; see Exhibit C, pp. 54-57. Cpl. Owen began chasing Lewis, and Cpl. Bordelon exited the vehicle and also chased after Lewis. See id. at 57. While running, Cpl. Owen allegedly gave commands for Lewis to "stop" but Lewis continued to run. Id. Lewis states that all he heard was "come here" and neither Cpl. Owen nor Cpl. Bordelon ever identified themselves as being police. See Exhibit G, p. 43. Lewis jumped over a fence and ran around the side of the apartment building at which time Cpl. Bordelon and Cpl. Owen lost sight of him. See Exhibit A-1; see Exhibit B, pp. 79-80; see Exhibit C, pp. 57-58.

After Lewis ran around the apartment building, he went to the top of the stairs of the building. See Exhibit G, p. 44. Officer Hayes, who heard on the radio that a black male fled from Cpl. Bordelon on foot, jumped a fence, and ran towards the apartment complex, drove his patrol unit into the parking lot of the complex and observed Lewis sitting at the top of the stairwell. See Exhibit D, Officer Hayes Deposition, pp. 38, 90. Officer Hayes exited his vehicle and Lewis began walking down the stairs. See id. at 38. Lewis raised both of his hands and Officer Hayes saw that he had blood coming down his arm. Officer Hayes ordered Lewis to come towards him. See id. at 90. Initially, Lewis did not comply with Officer Hayes' order until Officer Hayes pulled out his Taser and ordered Lewis to get on the ground. See Exhibit A-2, Officer Hayes Video[1] beginning at 18:19; see Exhibit D, pp. 90-91. When Lewis failed to comply with commands to get on the ground, Officer Hayes performed a straight arm-bar takedown and placed Lewis on the ground. See

[1] Officer Hayes' video is a dash cam mounted inside his patrol car, not a body camera.

Exhibit D, pp. 38, 91, 103. Officer Hayes ordered Lewis to put his hands behind his back and was eventually able to pull Lewis' arms out from under him and handcuff him. See Exhibit A-2; see Exhibit D, pp. 38, 92.

After Officer Hayes handcuffed Lewis, Cpl. Bordelon and Cpl. Owen arrived and assisted Lewis off the ground. See Exhibit A-1; see Exhibit B, p. 81. At this time, other officers at the scene indicated that Lewis was not the robbery suspect, but according to Cpl. Owen and Cpl. Bordelon, Lewis' actions warranted further detention and arrest. See Exhibit B, pp. 94-96; see Exhibit C, pp. 62-63. Cpl. Bordelon and Officer Hayes then began escorting Lewis to Cpl. Tong's CRU patrol unit. See Exhibit A-1; see Exhibit B, pp. 83, 109-110; see Exhibit D, p. 54.

Cpl. Bordelon explained to Lewis which car he was going to get into, but Lewis allegedly began jerking away from them. See Exhibit B, p. 113. Lewis testified that he never attempted to pull or jerk away. See Exhibit G, p. 67. Cpl. Bordelon gave commands for Lewis to stop pulling away, but Lewis allegedly ignored the commands and continued to actively resist the officers and forcefully pull away. See Exhibit B, p. 113. At one point, Cpl. Bordelon stated to Lewis: "if you pull away from me again I'm going to fuck you up." See Exhibit B, pp. 113, 116-118. Lewis allegedly jerked his arm out of Officer Hayes' control and Cpl. Bordelon attempted to take better control of him. See Exhibit A-1; see Exhibit A-2, Officer Hayes Video beginning at 18:22:35; see Exhibit B, pp. 84, 109-110, 113, 116-118; see Exhibit D, pp. 58-60, 93. As they neared the car and Lewis again pulled away, Cpl. Bordelon forcefully placed Lewis to the side of the car. See Exhibit B, p. 135. Cpl. Bordelon shouted, "What the fuck are you doing?" and gave him verbal commands to get in the car, but Lewis allegedly refused. See Exhibit A-2, Officer Hayes Video

beginning at 18:22:50; <u>see</u> Exhibit B, p. 131. Lewis denies that he refused the verbal commands to get inside the car. <u>See</u> Exhibit G, p. 66. Cpl. Bordelon dragged Lewis to the back door as Lewis continued to allegedly actively try to pull away. <u>See</u> Exhibit B, pp. 136-137. Lewis denies that he actively tried to pull away. <u>See</u> Exhibit G, p. 66. As they reached the door, Lewis straightened his body so that his upper torso or shoulder area was against the top of the door frame and allegedly refused to get into the car. <u>See</u> Exhibit B, p. 137. Lewis alleges that he shifted his body in order to defend himself from the physical and violent force being used against him. <u>See</u> Exhibit H, Lewis Deposition, p. 123. Cpl. Bordelon was able to push Lewis into the car, but Lewis fell into the car on his back. <u>See</u> Exhibit B, pp. 144-145. Lewis' upper body was in the vehicle and his lower body outside of the vehicle with his feet on the ground. <u>See id.</u> at 144. When Cpl. Bordelon tried to pick up Lewis' legs to get them into the car, Lewis began kicking him in the groin area. <u>See id.</u> at 139, 143. Lewis denies ever kicking Cpl. Bordelon. <u>See</u> Exhibit G, p. 67. After Lewis allegedly kicked Cpl. Bordelon several times, Cpl. Bordelon pulled his PR24 (baton) and struck Lewis on the side of the leg below the knee. <u>See</u> Exhibit B, pp. 139, 143. Despite being struck in the leg with the baton more than once, Lewis continued to kick and thrash around. <u>See id.</u> at 150. Cpl. Bordelon then hit Lewis in the jaw area. <u>See id.</u> at 152. Meanwhile, Cpl. Tong was attempting to pull Lewis from the other side of the vehicle. <u>see</u> Exhibit E, Cpl. Tong Deposition, p. 80. He was unsuccessful and Cpl. Owen replaced Cpl. Tong in the vehicle. <u>See id.</u> at 86. After Cpl. Bordelon struck Lewis in the jaw area, Cpl. Owen was able to pull Lewis into the vehicle and officers were able to shut the door. <u>See</u> Exhibit A-1; <u>see</u> Exhibit A-2, Cpl. Tong Video, Camera 2; [2] <u>see</u> Exhibit B,

---

[2] Cpl. Tong's video is a dash cam mounted inside his patrol car, not a body camera.

pp. 136-149, 152; <u>see</u> Exhibit C, pp. 95-96, 100-104; <u>see</u> Exhibit E, p. 80. It is clear to the Court based on the audio evidence available that the scene can be best described as chaotic, specifically when the Cpl. Bordelon attempted to place Lewis inside the patrol car.

Due to a large crowd having gathered around the patrol unit in the parking lot of the apartment complex, the Defendant Officers moved Lewis to a parking lot across the street at Huntington High School. <u>See</u> Exhibit C, pp. 74-75; <u>see</u> Exhibit D, pp. 94, 98-101. The Shreveport Fire Department EMS was called to Huntington High School to evaluate Lewis. <u>See</u> Exhibit F, Robert Smith Deposition, p. 34. When they arrived, EMS determined that Lewis needed medical attention due to the lacerations on his hands. <u>See id.</u> at 48. While at Huntington High School, Lewis was also found to have an active warrant from the Texas Department of Criminal Justice for violation of his parole. <u>See</u> Exhibit A-1; <u>see</u> Exhibit A-3, Jail Records; <u>see</u> Exhibit B, p. 98.

EMS released Lewis to be transported to the City Jail (Exhibit K), but the Shreveport City Jail does not allow any person to be booked into the jail without first being transported to the hospital if the person has an open wound. <u>See</u> Exhibit A-11, Jail Bureau Order SCJ S-501. Lewis was transported to University Health where he was again treated for mostly superficial cuts on his hands. <u>See</u> Exhibit L, University Health Medical Records. Lewis was then booked into the Shreveport City Jail on charges of battery on a police officer in violation of La. Rev. Stat. § 14:34.2, resisting an officer in violation of La. Rev. Stat. § 14:108, and being a fugitive. <u>See</u> Exhibit A, A-1, and A-3. On July 15, 2014, Lewis pled guilty and received a sentence of thirty (30) days in jail on each charge, with each sentence to run concurrent. <u>See</u> Exhibit S, Certified Minutes. On November 5, 2014, after

a motion to set aside guilty plea was filed by Lewis' counsel, the charges were *nolle prossed*. Id.

Lewis initiated this action on July 10, 2015, pursuant to 42 U.S.C. § 1983. Lewis asserts federal and state law claims of false arrest, excessive force, failure to intervene, negligent hiring, training, and/or supervision, assault, battery, false imprisonment, malicious prosecution, and civil conspiracy. See Record Document 1.

## LAW AND ANALYSIS

**I.    The Summary Judgment Standard**

Rule 56 of the Federal Rules of Civil Procedure governs summary judgment. This rule provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248, 106 S. Ct. at 2510. "A party asserting that a fact cannot be or is genuinely disputed must support the motion by citing to particular parts of materials in the record." Fed R. Civ. P. 56(c)(1)(A). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . grant summary judgment." Fed. R. Civ. P. 56(e)(3).

In a summary judgment motion, "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and

identifying those portions of the pleadings . . . [and] affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp., 477 U.S. at 323, 106 S. Ct. at 2553 (internal quotations and citations omitted). If the movant meets this initial burden, then the non-movant has the burden of going beyond the pleadings and designating specific facts that prove that a genuine issue of material fact exists. See id. at 325, 106 S. Ct. at 2554; see Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994). A non-movant, however, cannot meet the burden of proving that a genuine issue of material fact exists by providing only "some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." Little, 37 F.3d at 1075. Additionally, in deciding a summary judgment motion, courts "resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is when both parties have submitted evidence of contradictory facts." Id. Courts "do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." Id.

Ordinarily, when considering motions for summary judgment, the court must construe all facts and inferences in the light most favorable to the nonmovant. Cooper Tire & Rubber Co. v. Farese, 423 F.3d 446, 456 (5th Cir. 2005). However, the court should not consider a nonmovant's testimony where such testimony is blatantly contradicted by the record. See Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); Carnaby v. City of Houston, 636 F.3d 183, 187 (5th Cir. 2011).

Finally, "[w]hen evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment that evidence is not properly before the district court." Malacara v. Garber, 353 F.3d 393, 405 (5th Cir.2003). "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." See id. at 405 (internal citations and quotations omitted); see also de la O v. Hous'g Auth. of El Paso, 417 F.3d 495, 501 (5th Cir.2005) ("Judges are not like pigs, hunting for truffles buried in briefs.") (quoting United States v. Dunkel, 927 F.2d 955, 956 (7th Cir.1991)). Further, the Court has no obligation to raise and analyze a party's position in the absence of that party's meaningfully briefing the point. Cf. United States v. Griffith, 522 F.3d 607, 610 (5th Cir.2008) ("It is a well-worn principle that the failure to raise an issue on appeal constitutes waiver of that argument").

## II. Qualified Immunity

The doctrine of qualified immunity insulates government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982). Qualified immunity is "an immunity from suit rather than a mere defense to liability." Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S. Ct. 2806, 2815 (1985). Therefore, the defense of qualified immunity is "effectively lost if a case is erroneously permitted to go to trial." Id. at 526, 105 S. Ct. at 2815. Accordingly, qualified immunity questions should be resolved by courts at the earliest possible stage in litigation. See Hunter v. Bryant, 502 U.S. 224, 227, 112 S. Ct. 534, 536 (1991).

Claims of qualified immunity require a two-step analysis. <u>Saucier v. Katz</u>, 533 U.S. 194, 201, 121 S. Ct. 2151, 2155 (2001). First, the court must determine whether "the facts alleged show the officer's conduct violated a constitutional right." <u>Id.</u> at 201, 121 S. Ct. at 2155. Second, if a violation has been established, the court must then determine whether the officer's actions were objectively reasonable in light of clearly established law at the time of the conduct in question. <u>See id.</u> "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." <u>Id.</u> at 202, 121 S. Ct. at 2156; <u>see also</u> <u>Goodson v. Corpus Christi</u>, 202 F.3d 730, 736 (5th Cir. 2000) ("the touchstone of this inquiry is whether a reasonable person would have believed that his conduct conformed to the constitutional standard in light of the information available to him"). Accordingly, if officers of reasonable competence could disagree as to whether the plaintiff's rights were violated, the officer's qualified immunity remains intact. <u>Tarver v. City of Edna</u>, 410 F.3d 745, 750 (5th Cir. 2005).

Courts need not evaluate the two questions in any particular order. <u>Pearson v. Callahan</u>, 555 U.S. 223, 236, 129 S. Ct. 808, 818 (2009) (lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand"). Furthermore, although nominally an affirmative defense, the plaintiff has the burden to negate the defense of qualified immunity once properly raised. <u>Brumfield v. Hollins</u>, 551 F.3d 322, 326 (5th Cir. 2008).

## A. False Arrest

Claims of false arrest implicate the Fourth and Fourteenth Amendments' guarantee of the right against unlawful searches and seizures. U.S. Const. amend. IV; U.S. Const. amend. XIV; Thomas v. Kipperman, 846 F.2d 1009, 1011 (5th Cir. 1988). To prevail on a constitutional claim of "unlawful arrest" or "false arrest," a plaintiff must show that he was arrested without probable cause. Brown v. Lyford, 243 F.3d 185, 189 (5th Cir. 2001). Probable cause exists when there are "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." Michigan v. DeFillippo, 443 U.S. 31, 37, 99 S. Ct. 2627, 2632 (1979). However, qualified immunity shields an officer from liability "even if he 'reasonably but mistakenly concludes that probable cause is present.'" Evett v. DETNTFF, 330 F.3d 681, 688 (5th Cir. 2003) (quoting Mangieri v. Clifton, 29 F.3d 1012, 1016 (5th Cir. 1994)).

Lewis was arrested for resisting an officer in violation of La. Rev. Stat. § 14:108, and battery on a police officer in violation of La. Rev. Stat. § 14:34.2. The battery on a police officer charge will be addressed by the Court infra. La. Rev. Stat. § 14:108 defines "resisting an officer" as:

> Resisting an officer is the intentional interference with, opposition or resistance to, or obstruction of an individual acting in his official capacity and authorized by law to make a lawful arrest, lawful detention, or seizure of property or to serve any lawful process or court order when the offender knows or has reason to know that the person arresting, detaining, seizing property, or serving process is acting in his official capacity.

La. Rev. Stat. § 14:108.

In the Supreme Court's landmark case regarding whether the "stop and frisk" practice of police officers violated a person's Fourth Amendment right of protection from unreasonable searches and seizures, the Court held that a law enforcement officer may stop and briefly detain an individual for investigative purposes if they have a reasonable suspicion that criminal activity is afoot, even if the officer lacks probable cause. <u>Terry v. Ohio</u>, 392 U.S. 1, 22, 88 S. Ct. 1868, 1880 (1968) (emphasis added). Reasonable suspicion supporting the detention exists when the officer is able to point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" that detention. <u>Id.</u> at 21, 88 S. Ct. at 1880. Thus, the facts available to the officer at the moment of the detention, when judged against an objective standard, must "warrant a man of reasonable caution in the belief that the action taken was appropriate." <u>Id.</u> at 22, 88 S. Ct. at 1880.

Pursuant to La. Rev. Stat. § 14:108, it is a criminal offense for a person to resist detention when officers have reasonable suspicion that criminal activity is afoot. However, Lewis argues that running from police, without having committed any other offense, is not a criminal offense in Louisiana. <u>See</u> Record Document 48-1 at 10. In support of this argument, Lewis relies on <u>State v. Nix</u>, 406 So.2d 1355 (La.1981) and other cases cited in his opposition. <u>See id.</u> at 12-14. However, Lewis' argument is without merit. At the time <u>Nix</u> was decided, the statute prohibited only interference with an official "authorized to make a lawful arrest or seizure of property, or to serve any lawful process or court order." 406 So.2d at 1356. Nonetheless, the statute was amended by 2006 La. Act 132 of 2006 (La. HB 26) to include the phrase "lawful detention," and a person may now be charged

for resisting lawful detention the same as resisting a lawful arrest. See State v. Manuel, 2006-0486 (La. App. 4 Cir. 11/21/06), 946 So.2d 245, 248.

In this particular case, as discussed supra, Cpl. Bordelon and Cpl. Owen had reasonable suspicion to detain Lewis for an investigatory stop. Cpl. Bordelon and Cpl. Owen were looking for a robbery suspect known to be a black male, they knew that the suspect was residing at the TreeTop Apartments, the apartment manager informed Cpl. Bordelon that the suspect was last seen in the location that Lewis was first spotted, and Cpl. Bordelon and Cpl. Owen observed Lewis, a black male, on the trail where the suspect was last seen, and no other persons were in the vicinity. Accordingly, the Court finds that these facts were sufficient to give rise to reasonable suspicion to detain Lewis and investigate and either confirm or dispel their suspicions that Lewis was the suspect or had knowledge relevant to the officers' search for the suspect. When Lewis ran and refused to submit to the lawful detention, he committed the offense of resisting an officer in violation of La. Rev. Stat. § 14:108, which gave the officers probable cause to arrest him.

Furthermore, Lewis' argument that he did not know that Cpl. Bordelon and Cpl. Owen were police officers lacks merit. The statute provides that it is an offense to resist a lawful detention if the person knows or has reason to know that the person is a police officer. La. Rev. Stat. § 14:108. Here, Cpl. Bordelon and Cpl. Owen were in a marked unit which was clearly identifiable as a government vehicle. See Exhibit C-2. They were also wearing gray polo shirts with the Shreveport Police emblem on each shoulder and black tactical vests with "POLICE" written in white letters across the front and back. See Exhibit C, pp. 15, 16, 54-55; see Exhibit E, p. 55; see Exhibit K-3. Lewis cannot reasonably argue that he had no reason to know that Cpl. Bordelon and Cpl. Owen were police officers.

Therefore, the Defendant Officers, in arresting Lewis, did not violate his constitutional right against unreasonable searches and seizures. Accordingly, the Defendant Officers are entitled to qualified immunity.

Assuming *arguendo* that Lewis has raised a genuine issue of material fact relating to whether the Defendant Officers committed a constitutional violation in arresting Lewis, the qualified immunity standard still insulates the Defendant Officers from liability. The question now is whether the Defendant Officers' actions were objectively reasonable in light of clearly established law at the time of the conduct in question. See Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001). If officers of reasonable competence could disagree as to whether the plaintiff's rights were violated, the officer's qualified immunity remains intact. Tarver v. City of Edna, 410 F.3d 745, 750 (5th Cir. 2005). Lewis attempts to rely on the testimony of other officers in the Shreveport Police Department to support his argument that running from police does not violate La. Rev. Stat. § 14:108. However, statutory interpretation is not the job of police officers, but the job of the judiciary and lawyers. Accordingly, each of the Defendant Officers' actions were objectively reasonable; thus, the Defendant Officers are entitled to qualified immunity for the claims against them. Therefore, the false arrest claim against the Defendant Officers is **DISMISSED**.

**B.    Excessive Force**

An arrestee's right to be free from excessive force during a seizure is clearly established. U.S. Const. amend. IV; Deville v. Marcantel, 567 F.3d 156, 169 (5th Cir. 2009). In order to overcome a law enforcement officer's assertion of qualified immunity on a claim of excessive force, a plaintiff must establish: "(1) an injury, (2) which resulted

directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." Poole v. City of Shreveport, 691 F.3d 624, 628 (5th Cir. 2012) (quoting Ontiveros v. City of Rosenberg, 564 F.3d 379, 382 (5th Cir. 2009)).

The United States Supreme Court has recognized that a constitutional violation does not occur every time an officer uses force against an arrestee. Graham v. Connor, 490 U.S. 386, 396-97, 109 S. Ct. 1865, 1872 (1989) ("[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers…violates the Fourth Amendment"). Rather, "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Id. at 396, 109 S. Ct. at 1872. Excessive force claims are thus necessarily fact-intensive and depend on the facts and circumstances of each particular case. Id. ("[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."). Factors that may be considered include: "(1) the need for the application of force; (2) the relationship between that need and the amount of force that was used; (3) the extent of the injury inflicted; and (4) whether the force was applied in a good faith effort to maintain and restore discipline or maliciously and sadistically for the very purpose of causing harm." Id. at 390, 109 S. Ct. at 1869.

In determining whether the use of force was clearly excessive and clearly unreasonable, the Court should evaluate each officer's actions individually to the extent possible. Meadours v. Ermel, 483 F.3d 417, 420-21 (5th Cir. 2007). Accordingly, Lewis' claims against Cpl. Bordelon, Cpl. Owen, and Officer Hayes will be discussed separately.

Lewis does not assert a claim for excessive force against Cpl. Tong. See Record Document 1; see also Exhibit G, p. 72.

### i.    Cpl. Bordelon

Lewis alleges that Cpl. Bordelon shoved him, punched him, struck him with a baton, and sodomized him. See Record Document 1 at ¶¶ 20-22; see Exhibit G, pp. 57-59. Lewis supports these allegations in his deposition detailing what occurred:

Q.    What happened after -- or who shoved you?

A.    Chris was the one that shoved me.

Q.    What happened after he shoved you?

A.    And, well, the man got to - the man got to beating from my feet to my legs to my hamstrings…so after the man stopped beating my feet, my legs, and my hamstrings right there, he - I like - I managed - I'm like trying to squirm to get - like reposition myself in the back seat. But it's hard, me being in handcuffs, to do that and how I'm positioned. So like before I could get myself turned over from my stomach to either on my back or on my butt, the man begins to poke, you know, like in my buttocks. . . . So the man got to poking like into my buttocks like that, and he's doing this type motion like a jugging type motion. And I'm squirming and moving. And I do manage -- now, shit, if you didn't have the strength to move, that's going to give you the strength. So as a man -- see, I've been molested before as a young boy, so, you know, I don't play that shit. So it's like that was the ultimate disrespect to me, period. My momma ain't raised no girl. You know what I mean? So I manage to turn over. When I turned over and I sit up, the lawman then went from beating my legs and stuff and poking at my anus with the stick to now you done start punching me in my face.

Q.    Now who are we talking about?

A.    This is the same man.

Exhibit G, pp. 54-59.

From the facts set forth in the background section and Lewis' deposition testimony, it is clear to the Court that the scene can best be described as chaotic.

In the present action, the Court need not address prongs two and three required to succeed on an excessive force claim because Lewis has failed to offer evidence showing injury. Therefore, Lewis has not suffered a constitutional violation. To the extent Lewis alleges he suffered bruises and cuts from the incident (Exhibit R, Response to Interrogatory No. 15), such injuries are *de minimis* and do not give rise to a constitutional violation. See Hudson v. McMillian, 503 U.S. 1, 9-10, 112 S. Ct. 995, 1000-01 (1992) (recognizing that "*de minimis* uses of physical forces are insufficient to establish a constitutional violation); Ikerd v. Blair, 101 F.3d 430, 433-34 (5th Cir. 1996) ("The Fifth Circuit requires a plaintiff to have 'suffered at least some injury.'"); see also Carthon v. Prator, 2009 WL 3347115, 2009 U.S. Dist. LEXIS 98464 (W.D.La. 10/14/09) (a scrape on the plaintiff's forehead was insufficient to establish a constitutional violation); Houston-Hines v. Houston Indep. Sch. Dist., 2006 WL 870459, *5 (S.D.Tex. April 5, 2006) (scratches, bruises, and soreness for about one week after the incident were held to be nothing more than *de minimis* injuries and were not sufficient to raise a genuine issue of material fact to support the first element of an excessive force claim). Lewis argues that he was deemed to be a "trauma" patient by the responding EMS on the scene and his injuries were listed as "traumatic." Exhibit F, p. 31. However, Lewis fails to point to the part of Captain Smith's testimony explaining the meaning of "traumatic." In defining a traumatic injury Captain Smith explained that "[a]nytime somebody receives a laceration, be it a paper cut, that's defined as a traumatic injury." Id. "Lewis had lacerations to his finger." Id. The Court finds this to be a *de minimis* injury.

Furthermore, Lewis has failed to raise a genuine issue of material fact concerning his injury from the alleged sodomy. It is true that Lewis testifies that he was sodomized

by Cpl. Bordelon. However, Lewis failed to alert Captain Smith, the paramedic at the scene, and the attending physician at University Health of any injury to his rectal area. Lewis argues that he was humiliated and embarrassed, and there were Shreveport officers present in the room while he was being treated, including one of the officers that attacked him. However, this does not justify his failure to alert the attending physician that an injury occurred to his rectal area due to the alleged sodomy nor does it justify his failure to alert Captain Smith. Furthermore, Lewis has failed to offer any evidence that he sought medical treatment for the alleged sodomization once he was released from jail. Accordingly, due to the abject failure to provide medical documentary evidence or any other evidence of an injury as a result of sodomization, Lewis has failed to raise a genuine issue of material fact as to an injury. It should be noted that the Court finding that Lewis failed to raise a genuine issue of material fact as to the injury element is not a credibility determination, but an absence of evidence determination. Therefore, Lewis' excessive force claim against Cpl. Bordelon is **DISMISSED**.

> ### ii.     Cpl. Owen

Although Lewis asserts a claim against Cpl. Owen for excessive force, his only allegations against Cpl. Owen are that he "demanded he approach the vehicle" and that he chased Lewis "without cause." Record Document 1, ¶¶ 13, 15. Lewis also testified that he had no complaints against any officer other than Cpl. Bordelon:

> Q.     So no other officer other than Officer Bordelon used any force against you while you were in the patrol unit or being put into the patrol unit?
>
> A.     No, ma'am.

Exhibit G, p. 72.

Furthermore, Cpl. Owen testified that he did not punch, kick, use a baton, mace, or tase Lewis. See Exhibit C, p. 138. Cpl. Owen's only physical interaction with Lewis was grabbing Lewis from behind and pulling him into the vehicle, an action which did not cause any injuries to Lewis. See id. at pp. 102, 138; see Exhibit A-2, Tong Video, Camera 2. Lewis has failed to overcome Cpl. Owen's assertion of qualified immunity because he has failed to raise a genuine issue of material fact as to injury sustained, whether the injury resulted from force that was clearly excessive, and whether the excessiveness was clearly unreasonable. Accordingly, Lewis' excessive force claim against Cpl. Owen is **DISMISSED**.

### iii.    Officer Hayes

Lewis' own testimony establishes that he cannot raise a genuine issue of material fact as to any of the elements required to prove an excessive force claim against Officer Hayes:

A.    And when he turned and seen me coming down the stairs, he...hurried up and jumped out the car. And before I could get close to him at all, the man, he draws down on me and tells me –

Q.    What do you mean by draws down?

A.    Draws down like Clint Eastwood, you know. He drew down.

Q.    Did he pull a weapon?

A.    Yes. And when he did that he was like, Get on the ground, get on the ground. And I'm trying to explain to the man what's going on with me, and the man wasn't trying to hear me, you know, regardless. He wasn't trying to hear nothing, you know. So I seen in the man's body language and in his eyes and in the tone of his voice he was using, okay, this man is serious, you better get down. So I get down like, Hey, man, don't shoot, don't shoot, don't shoot. He steady, you know what I'm saying, indicating that he's going to shoot if you don't get down. So when I get down on the ground, he hurry and runs over

there and he puts his knee in the middle of my back, swings my arms around me –

Q.     Did you go to the ground by yourself?

A.     It was like at the same time – how can I say this? Like – I don't know if this makes sense to you or not, it was like a parallel motion, basically like – what I mean by that is two things happening at the same time in motion...

Q.     What did the officer do to get you on the ground?

A.     Basically just like pushed me down. **It wasn't anything more than that. He just did enough force to where he could – he knew I was going on the ground for sure. And it was enough.**

Exhibit G, pp. 45-47 (emphasis added).

Q.     So you don't have any complaints about the officer – the first officer that approached you when you were sitting on the steps and took you to the ground?

A.     **[T]he man pushed me to the ground and cuffed me. That's it** . . .

Q.     [D]id he punch you at any time?

A.     No, ma'am. It wasn't him that did that.

Q.     Did he kick you?

A.     One time, I believe.

Q.     When did he kick you?

A.     That's when I was on the ground?

A.     [H]e wasn't overly aggressive. I'd be lying if I said the man was overly aggressive. He wasn't. He did the basic to get me – 'cause really I was being compliant already as it was. He just gave me a little help pretty much.

Q.     [Y]ou don't recall any specific injuries from being kicked?

A.     No, ma'am.

Id. at pp. 69-71 (emphasis added).

Lewis admits that he did not suffer any injury from a result of any actions of Officer Hayes and further admits that the use of force was not excessive or "overly aggressive." Therefore, Lewis has failed to raise a genuine issue of material fact as to any of the elements of an excessive force claim in order to survive the present Motion for Summary Judgment. Accordingly, Lewis' excessive force claim against Officer Hayes must is **DISMISSED**.

## C.     Failure to Intervene

Lewis also asserts claims against the Defendant Officers for allegedly failing to intervene to prevent the deprivation of his right to be free from the use of excessive force. Generally, to prevail on a failure to intervene/bystander liability claim against an officer, the plaintiff must prove that the defendant officer:  (1) knows that a fellow officer is violating an individual's constitutional rights; (2) is present at the scene of the constitutional violation; (3) has a reasonable opportunity to prevent the harm; and (4) chooses not to act. Whitley v. Hanna, 726 F.3d 631, 646 (5th Cir. 2013). When the alleged constitutional violation by the other officer is excessive force, important considerations in deciding whether these elements are met are whether the defendant officer (1) observed the use of the alleged excessive force or (2) had sufficient time to prevent the use of excessive force. See Tufaro v. City of New Orleans, 2004 WL 1920937 at *4 n. 20, 2004 U.S. Dist. LEXIS 17146 at *12 n.20 (E.D. La. 2004) (citing Lanigan v. Vill. of E. Hazel Crest, 110 F.3d 467, 477 (7th Cir. 1997)).

As indicated supra, Lewis has failed raise of genuine issue of material fact as to the injury element of Lewis' excessive force claim. Therefore, he has failed to establish a violation of his constitutional right to be free from excessive force. Accordingly, Lewis

failure to intervene claim against the Defendant Officers must be **DISMISSED**, as there was no underlying constitutional violation.

### C. Section 1983 <u>Monell</u> Claim

Lewis asserts a Section 1983 claim against the City and alleges that the City maintained unconstitutional customs, practices and/or policies for using excessive force, providing inadequate training regarding how to detain suspects and the proper amount of force appropriate, providing inadequate training regarding how to intervene to stop other officers from using excessive force in detaining suspects, providing inadequate training regarding how to detain mentally ill persons and the proper amount of force appropriate in detaining mentally ill persons, employing and inadequately supervising and detaining individuals such as Defendant Officers who the City knew or should have known had dangerous propensities for abusing authority and using excessive force. <u>See</u> Record Document 1, ¶ 137.

"Cities are not liable for constitutional violations committed by city employees unless those violations result directly from a municipal custom or policy." <u>Sanders-Burns v. City Of Plano</u>, 594 F.3d 366, 380 (5th Cir. 2010). In order to hold a municipality liable under Section 1983 for the actions of its employees, a plaintiff must identify: (1) an official policy or custom, of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose "moving force" is that policy or custom. <u>Monell v. Dep't of Soc. Servs. of City of New York</u>, 436 U.S. 658, 694, 98 S. Ct. 2018, 2038 (1978). "A municipality's policy of failure to train its police officers can give rise to Section 1983 liability." <u>Sanders-Burns</u>, 594 F.3d at 380. However, such liability only attaches to a city, "where the failure to train amounts to deliberate indifference to the

rights of persons with whom police come into contact." City of Canton, Ohio v. Harris, 489 U.S. 378, 388, 109 S. Ct. 1197, 1204 (1989). If the failure to train amounts to deliberate indifference to the rights of persons with whom police come into contact, then that inadequate training can be said to represent a city policy. See id. at 390, 109 S. Ct. at 1205.

In the present action, as alluded to supra, Lewis has failed to allege facts that would establish he suffered a deprivation of his constitutional rights. See Whitley v. Hanna, 726 F.3d 631, 648 (5th Cir. 2013) ("[I]nadequate supervision, failure to train, and policy, practice, or custom claims fail without an underlying constitutional violation."). Therefore, Lewis' Monell claim against the City for failure to train must be **DISMISSED**. However, assuming *arguendo* that a constitutional violation occurred, Lewis has not established that a policymaker for the City was deliberately indifferent to his rights. Lewis argues that the City should have policies in place relating to use of force, application of laws, and responding to emotionally disturbed persons; thus, the City was deliberately indifferent to Lewis' rights. See Record Document 63-1 at 33-37. However, all the Defendant Officers are certified by the Louisiana Peace Officer Standards and Training Council ("P.O.S.T."). See Exhibits A-4–A-7. P.O.S.T. mandates 360 course hours and firearms qualifications, including training on use of force[3] and "Crisis Intervention When Dealing with Individuals with Mental Disorders." See Exhibits A-12, A-13. The Shreveport

---

[3]The City of Shreveport's policy concerning use of force is set forth in Shreveport Police Department General Order 601.10, which states in relevant part: "It shall be the policy of the Shreveport Police Department that the police officers use reasonable application of subject management techniques to effectively bring an incident under control, while protecting the lives, safety, and security of the officers or others." Exhibit A-9, p. 1.

Police Department also requires that its officers undergo additional training during the academy and annual retraining. See Exhibit A-12. The training required of the Defendant Officers establishes that the City was not deliberately indifferent to Lewis' rights or the rights of persons with whom police come into contact. Accordingly, that training cannot be said to be inadequate and Lewis has failed to raise a genuine issue of material fact supporting such an argument. Therefore, Lewis' Monell claim for failure to train must be **DISMISSED**.

## III. State Law Claims

Lewis asserts state law claims of false arrest, excessive force, negligent hiring, training, or supervision, assault and battery, and malicious prosecution. See Record Document 63-1 at 39-43. The Court will discuss these state law claims infra.

### A. False Arrest and Excessive Force

Under Louisiana law, the same standards are used in analyzing state law claims of false arrest and excessive force as constitutional claims, namely, whether the officer's actions were "reasonable" under the circumstances. See Reneau v. City of New Orleans, 2004 U.S. Dist. LEXIS 12415, 2004 WL 1497711, *3-4 (E.D.La. July 2, 2004). For the reasons discussed supra, the Defendant Officers' actions were reasonable under the totality of the circumstances and Lewis' state law claims of false arrest and excessive force are **DISMISSED**.

### B. Negligent Hiring, Training, or Supervision

In order to hold the City liable for negligent hiring, training, or supervision, Lewis must prove: (1) the City had a duty to conform its conduct to a specific standard ("the duty element"); (2) the City failed to conform its conduct to the appropriate standard ("the

breach of duty element"); (3) the City's substandard conduct was a cause-in-fact of her injuries ("the cause-in-fact element"); (4) the City's substandard conduct was a legal cause of her injuries ("the scope of liability or scope of protection element"); and (5) actual damages. See Roberts v. Benoit, 605 So.2d 1032 (La. 1991).

As discussed supra, all Defendant Officers are P.O.S.T. certified and have been trained on use of force in compliance with state requirements. Consequently, Lewis cannot show that the City breached its duty to adequately train officers. Lewis also cannot establish any injury which was caused by the alleged inadequate training. Therefore, Lewis negligent hiring, training, and/or supervision claim against the City is **DISMISSED**.

### C.    Assault and Battery

Assault is an attempt to commit a battery, or the intentional placing of another in reasonable apprehension of receiving a battery. La. Rev. Stat. § 14:36. Battery is an intentional harmful or offensive contact with another person. La. Rev. Stat. § 14:33. "In assault and battery cases the plaintiff has the same general burden of proof which any plaintiff has in a tort or damage suit." Douget v. Johnson, 463 So.2d 64, 66 (La. App.3rd Cir. 1985). "Under Louisiana law, the torts of assault and battery, when raised against a law enforcement officer acting in the course and scope of his employment, require a showing that the law enforcement officer acted with unreasonable or excessive force." Wagster v. Gautreaux, 2013 U.S. Dist. LEXIS 168299, *56 (M.D.La. 11/26/13). "In the absence of the use of excessive force, a law enforcement officer cannot be held liable for assault and battery if the assault and battery occurred during a lawful arrest." Id. at *56.

For the reasons stated <u>supra</u>, Lewis' excessive force claim fails because he failed to show injury. Furthermore, the arrest of Lewis was lawful. Accordingly, the state law claims of assault and battery are **DISMISSED**.

### C.    Malicious Prosecution

To establish a claim for malicious prosecution, the plaintiff must prove six elements: (1) the commencement or continuance of an original criminal or civil judicial proceeding, (2) its legal causation by the present defendant against the plaintiff who was defendant in the original proceeding, (3) a bona fide termination in favor of the present plaintiff, (4) the absence of probable cause for such proceeding, (5) the presence of malice therein, and, (6) damage. <u>Craig v. Carter</u>, 30-625 (La. App. 2 Cir. 9/23/98), 718 So.2d 1068, 1070.

Lewis cannot maintain a claim for malicious prosecution because he cannot establish the absence of probable cause for the criminal proceedings. As discussed <u>supra</u>, the Defendant Officers had probable cause to arrest Lewis for the crime of resisting an officer in violation of La. Rev. Stat. § 14:108.  Accordingly, Lewis state law claim for malicious prosecution is **DISMISSED**.

### D.    Civil Conspiracy

Louisiana Civil Code Article 2324(A) provides that "he who conspires with another person to commit an intentional or willful act is answerable, *in solido*, with that person for the damage caused by such act." The conspiracy by itself is not the actionable claim under La. Civ. Code art. 2324, it is the underlying tort the conspirators agree to perpetrate and actually accomplish that constitutes the actionable element of the claim. <u>Ross v. Conoco, Inc.</u>, 2002-0299 (La. 10/15/02), 828 So.2d 546, 552.

In the present action, Lewis has not presented any evidence demonstrating that the Defendant Officers' conspired together to cause any injury to Lewis, nor has be presented any evidence that the Defendant Officers' actions were motivated by ill will. Accordingly, Lewis' state law conspiracy claim is **DISMISSED**.

## CONCLUSION

The Defendants' Rule 56 Motion for Summary Judgment (Record Document 53) is **GRANTED.** All of Lewis' claims are hereby **DISMISSED WITH PREJUDICE**.

A judgment consistent with the terms of the instant Memorandum Ruling shall issue herewith.

**THUS DONE AND SIGNED**, in Shreveport, Louisiana, on this the 5th day of March, 2018.

S. MAURICE HICKS, JR., CHIEF JUDGE
UNITED STATES DISTRICT COURT